MEMORANDUM OF DECISION
This is an action for termination of parental rights brought by the Commissioner of the Department of Children and Families ("DCF"). The respondent, Shannon G., is the biological mother of the children. The respondent, Allan S., is the biological father of the children.
PROCEDURAL BACKGROUND
On August 14, 1998, DCF filed neglect petitions alleging that Jesse, Christopher and Anthony were neglected in that the children were being denied proper care and attention, physically, educationally, emotionally or morally and that the children were being permitted to live under conditions, circumstances or associations injurious to their well-being.Conn. Gen. Stat. § 46b-120 (8)(B)(C). The petitioner also alleged that the children had been abused. Conn. Gen. Stat. § 46b-120
(8)(D).
On August 14, 1998, the court granted DCF an order of temporary custody with regard to the children. The court also provided both parents specific steps to aid with reunification.
On February 4, 1999, the court adjudicated the children neglected and abused and committed them to the care and custody of DCF. Shannon and Allan received updated specific steps on that date.
On September 28, 1999, the court found that continuing efforts to reunite the family were no longer appropriate with regard to Jesse, Christopher and Anthony.
On October 21, 1999, DCF filed a petition for termination of parental rights of the biological parents. With regard to Shannon and Allan, the petitioner alleged that the children had been found in a prior proceeding to have been neglected and the mother and father had failed to achieve such a degree of personal rehabilitation as would encourage the belief CT Page 9707 that within a reasonable time, considering the needs and age of the children, they could assume a responsible position in the life of the children. Conn. Gen. Stat. § 17a-112 (c)(3)(B).
Allan was defaulted at the plea hearing for failure to appear after receiving in hand service. A Guardian ad Litem was subsequently appointed to do a diligent search for him. The guardian was successful in locating Allan and informed him of the court hearing date and the need for him to appear at trial. Allan failed to appear and was defaulted again on the first day of trial.
FACTUAL FINDINGS
The court makes the following findings by clear and convincing evidence.
On August 11, 1998, Shannon was arrested on two counts of risk of injury to a minor. She was arrested for whipping the two older children with a belt in a parking lot at her apartment building. A neighbor witnessed the attack and both children confirmed that Shannon had hit them with a belt. When Shannon was confronted by the police she admitted to hitting the children in the past with a belt but denied that she had done so on this occasion. She did admit to using profanity in the presence of the children including yelling at them to "get the f — k upstairs". Mother also told the police that she had every right to hit the children and that she would continue to do so if they acted up.
She was subsequently convicted on one count of risk of injury to a minor and one count of failure to appear and was given a five year suspended sentence with two years probation.
DCF provided Shannon with services to address her anger management problems. Specifically, she completed a six week anger management program at Catholic Family Services in March of 1999. She also completed a parenting class at Wheeler Clinic and voluntarily signed up and completed an additional six week program that ended in April of 1999. She also attended individual therapy at the Wheeler Clinic between December of 1999 and May of 2000. She also received a referral to Casey Family Services ("Casey") which is an intensive family reunification program. The services provided by Casey included extended supervised visits at Shannon's home, feedback on parenting issues, one on one visits with Shannon to discuss her progress and group meetings once per week. Casey also provided transportation and facilitated Shannon's meetings with the children's therapists.
Casey began providing reunification services in February of 1999. Initially, Casey observed one of Shannon's visits at DCF with her CT Page 9708 children. The visit was described as extremely chaotic with the children hitting, spitting and running around. The Casey supervised visits began at Shannon's home in March of 1999. While Shannon initially demonstrated appropriate parenting skills, the children continued to act in a chaotic and inappropriate manner. In April, Shannon's behavior began to deteriorate and it became apparent that the anger management and parenting training she had received had not been helpful. On April 13, 1999, Shannon reacted to the children's poor behavior by threatening to send them back to their foster mothers. On April 20, 1999, Shannon was impatient with the children and raised her voice. She was also defiant towards the worker who was trying to help her. On April 27, 1999, Shannon was again inappropriate with the children during a supervised visit. The children engaged in kicking, screaming and spitting and she began yelling and using profanity in the children's presence.
On May 4, 1999, Shannon's behavior escalated to the point where Casey determined that it could not continue to provide services. On that date, Shannon threw Jesse to the floor, put her foot next to his head, put her finger in his face and screamed that she did not want him and that she was going to wring his neck. The children were physically removed from the visit for their own safety.
The next evening, Shannon attended the Casey group meeting. She was still unable to control her rage and threatened to throw another group member out the window. She also threatened to hit one of the workers in the head.
Because of Shannon's deteriorating behavior toward her children, her inability to work cooperatively with Casey and her inability to follow the agreed upon service plan, Casey decided to close its case.[2] As part of its closing recommendations, Casey suggested that Shannon engage in individual counseling at the Nonviolence Alliance ("NOVA"). Shannon attended the intake sessions and then stopped after she was informed she would have to pay for the visits. She did have a full time job at that time. On her own initiative, Shannon began attending counseling at NOVA in January of 2000. NOVA does not provide reunification services.
Shannon was arrested on March 13, 2000, on a charge of Larceny 2. The charges are currently pending.
Dr. David Mantell performed interactional evaluations on November 23, 1998 and February 3, 2000. In 1998, he found that Shannon tested high on a scale for potential child abuse. She denied, however, that she had ever hit her children with a belt or that she had ever engaged in physical abuse or neglect. When Dr. Mantell reevaluated the family in February of 2000, he found that Shannon tested in the average range for potential CT Page 9709 child abuse. He also found, however, that she continued to lack maturity and judgement and continued to deny that she had ever hit her children too hard. He found this to be important because before an individual can be treated for behavioral problems, she needs to admit and take responsibility for her actions in order to begin the rehabilitative process. Dr. Mantell had strong concerns and was pessimistic about Shannon's ability to successfully care for any of the children because of the sizeable behavioral challenges the children pose and Shannon's continuing personality and parenting weaknesses. Dr. Mantell testified that the children's behavior problems were the result of the mother's home environment which had been chaotic and violent.
A partial description of the interactional visit in Dr. Mantell's office in February of 2000 provides insight as to the level of dysfunction within this family:
 Shannon admonished Jesse to stay on the couch. He was laying on the curtain which the mother left unattended until it fell to the floor. She argued with Christopher not to talk to her like that telling him he was disrespectful and he should sit quietly. He replied by telling her to `shut up.' . . . At that point, Jesse was building Lincoln Logs with his mother. Anthony was off on his own. The siblings did not pay attention to him. Then Anthony held a Lincoln Log in his mother's direction and she asked him if he wanted to go to time out telling him that he was worst(sic) than the other two put together. He began to tantrum, threw toys, and knocked a chair over. . . . The mother picked up the chair and went to Anthony and gave him a kiss. Christopher threw Lincoln Logs and Jesse, for the first time, politely asked if he could build Lincoln Logs. The mother told Jesse not to speak to Christopher who was in time out. Christopher threw a book on the floor and kicked the mother hard repeatedly. Mother and son actually began to struggle. She asked him why he was acting like this and he told her because she is bad. They then argued over who his mother is. Christopher said `she is!' Shannon replied `I am!'
 At that point, the mother said of Christopher `I want him out of here' and she cried. Christopher cried. He kicked down the Lincoln Log house. I had to help separate mother and son.
CT Page 9710Allan S.
Allan has a substance abuse problem with cocaine and alcohol. He was referred for counseling and initially denied any substance abuse problem. After he tested positive for cocaine, he failed to complete the program he was referred to at Mid State Behavioral Health. He was also referred for parenting classes but failed to attend. He has only visited the children sporadically since they were placed in the custody of DCF and has not seen them since January 25, 2000.
The Children
Jesse has severe behavioral problems due to the abuse and neglect he suffered while in his mother's home. He has been diagnosed with post traumatic stress disorder ("PTSD") and oppositional defiant behavior. As a young child, he was exposed to violent episodes between his parents and the use of extreme profanity. He will scream, hit, cry and use profanity when upset. This behavior is primarily seen when visiting with his mother and siblings. Because of Jesse's behavior problems, he is currently being home schooled and is receiving individual therapy. As of the time of trial, no pre-adoptive home has been identified for Jesse.
Christopher was also exposed to very inappropriate language and behavior which included domestic violence between his parents. He also suffers from PTSD and has acted violently towards his foster parents and other adults. On January 19, 1999, Christopher was brought to Yale New Haven Hospital as a result of head banging and posing a danger to himself. On April 22, 1999. he was hospitalized at Elmcrest Psychiatric hospital due to out of control behavior. He was discharged to his foster home with medication to treat his depression and impulsivity. There have been periods of time where Christopher has refused to visit with his mother and Dr. Mantell testified that Christopher is estranged from her. His foster mother is considering adopting him but has not made a commitment to do so.
Anthony is the most easygoing of the three children. A potential preadoptive home has been identified for Anthony.
ADJUDICATION
TERMINATION ADJUDICATION
A termination petition that can sever family ties implicates serious constitutional concerns. The United States Supreme Court held in Santoskyvs. Kramer, 455 U.S. 745, 753 (1982) that: "the fundamental liberty interests of natural parents in the care, custody and management of their CT Page 9711 child does not evaporate simply because they have not been model parents where they have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."
However, parents' constitutional rights do not exist in a vacuum without reference to the rights of others in the family. In particular, they do not override a child's right to be safe and to grow and to be nurtured in a supportive environment. As set forth in Conn. Gen. Stat.
§ 17a-101(a): "the public policy of this state is: to protect children whose health and welfare may be adversely affected through injury and neglect."
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF has "made reasonable efforts to locate the parent and reunify the child with the parent unless the court finds in the proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b
that such efforts are not appropriate." Id.
The court made the requisite finding on September 28, 1999, that reunification efforts were no longer appropriate with regard to the biological parents.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book §33-3(a). The relevant date in this case is October 21, 1999.
FAILURE TO REHABILITATE
A statutory ground for termination arises when "the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn.CT Page 9712Gen. Stat. § 17a-112 (c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C., 210 Conn. 157, 167
(1989).
No dispute exists that the court has previously found the children to have been "neglected" or "uncared for" thus satisfying a statutory prerequisite. The rest of the statute requires the court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. §17a-112 (c)(3)(B).
The petitioner has demonstrated by clear and convincing evidence that Shannon cannot assume a responsible position in the life of the children within a reasonable time. Despite having received anger management services, parenting skills training, and individual counseling, she was unable, in the presence of professionals, to control her rage towards the children. Shannon's behavior in the presence of Casey workers included yelling, using profanity, and ultimately using physical force and threats towards Jesse, who was only five years old. This behavior took place after she had completed anger management and parenting classes. The court therefore finds by clear and convincing evidence that she has failed to rehabilitate within the meaning of the statute.
Allan has not completed any substance abuse treatment and has only sporadically visited with his children. He has never presented a plan for his children. The court finds by clear and convincing evidence that he has also failed to rehabilitate within the meaning of the statute.
MANDATORY FINDINGS
With respect to Shannon G. and Allan S., as required by Conn. Gen.Stat. § 17a-112 (d), the court makes the following findings:
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Shannon was offered anger management classes, parenting classes, individual counseling, reunification services and visitation with her children. The court finds that timely and appropriate services were offered to Shannon.
Allan was offered a substance abuse program which he did not complete. CT Page 9713 He was also offered visitation with his children. These services were timely and appropriate.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance Child Welfare Act of 1980.
The court finds that DCF made reasonable efforts to reunite the family by offering timely and appropriate services to the parents including, programs to address Shannon's anger management problems and improve her parenting skills, and programs to address Allan's substance abuse problems.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Shannon did keep her whereabouts known to DCF, did visit with the children regularly and did attend the classes that she was referred to. She has not, however, benefitted from these services and continues to demonstrate behavior that threatens the psychological and physical welfare of her children.
Allan failed to complete a substance abuse program and was only sporadic in his visitation with his children.
4. The feelings and emotional ties of the child with respect to his parents, any guardian and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Jesse loves his mother. Christopher is estranged from his mother and views his foster mother as his psychological parent. It is unclear who Anthony views as his psychological parent although he does not have a close bond with his biological mother. The children have not seen their father since January of 2000.
5. The age of the child.
Jesse is six years old. Christopher is five years old. Anthony is three years old.
6. The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, and not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court CT Page 9714 may give weight to incidental visitations, communications or contributions and, (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Shannon attended the services that she was referred to by DCF. She did not, however, change her behavior as a result of receiving these services and therefore it is not in the best interest of the children to return them to her home.
Allan did not make any effort to change his circumstances.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person, or by economic circumstances of the parent.
Shannon and Allan have not been prevented from maintaining a relationship with their children by the unreasonable act of anyone.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn Gen. Stat.
§ 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Connecticut Practice Book 33-5.
"It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman v. Lycoming County Children's Services, supra,458 U.S. 502, 513 (1982).
Allan has not taken any of the steps necessary to make it in the best interest of the children to return them to him. Shannon's inability to control her rage towards her children was evident when she physically threatened Jesse in the presence of a Casey Family Services worker and also in Dr. Mantell's office when she engaged in a verbal and physical struggle with her five year old son, Christopher. Despite having received services she is clearly unable to parent these children in an appropriate and nurturing manner. Simply stated, none of the children would be physically or psychologically safe with her.
The children have been in DCF custody for two years. These children are CT Page 9715 young and deserve the opportunity to be adopted by families that can provide them a stable, safe and nurturing home. All of these boys need and deserve permanency. For all of these reasons, the court finds by clear and convincing evidence that it is in the best interest of the children to terminate the parental rights of Shannon G. and Allan S. Accordingly, a termination of the parental rights of Shannon G. and Allan S. is ordered.
It is further ordered that the Commissioner of DCF be appointed statutory parent for Jesse, Christopher and Anthony for the purpose of securing an adoptive home. The Commissioner shall file with this court, no later than 60 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
CHASE T. ROGERS JUDGE OF THE SUPERIOR COURT